UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

In re

ANDREW GREENHUT,

Debtor.

Chapter 13
Case No. 19-10782-JNF

## POST-TRIAL MEMORANDUM OF CREDITOR GITA SRIVASTAVA

Respectfully submitted,

GITA SRIVASTAVA,

By her attorneys,

*/s/  Alex F. Mattera*
Alex F. Mattera, BBO No. 641760
Pierce Atwood LLP
100 Summer Street, 22nd Floor
Boston, MA 02110
Telephone:  (617) 488-8112
Email:      amattera@pierceatwood.com

Dated:  June 25, 2021

13320466.1.1.1.1.1

INTRODUCTION ................................................................................................ 3

I.  UNDISPUTED FACTS ................................................................................ 4

  A.  Debtor's Undisputed Obligations under the Agreed Divorce Judgment ........................ 5

    1.  Debtor's Baseless Litigation, 2016-2020 .................................................. 6

    2.  Srivastava's Forced Collection Efforts ..................................................... 7

  B.  Undisputed Evidence of Debtor's Income and Value of Srivastava's Claim ................. 8

  C.  Undisputed Evidence and Testimony of Debtor Shows he Misrepresented his
      Employment and Income .................................................................. 9

  D.  Undisputed Evidence and Testimony of Debtor Shows He had No Meaningful Non-
      Insider Debts and No Pressure from Any Creditors ...................................... 12

  E.  Undisputed Evidence and Testimony of Debtor and His Parents Shows the Alleged
      "Loans" were Actually Gifts, Mischaracterized to Reduce Tax Liability and Dilute
      Srivastava's Claim .................................................................... 14

  F.  Taken Together, Undisputed Evidence Shows Debtor's Filings Paint a Purposefully
      Incomplete and Inaccurate Picture of His True Financial Situation ..................... 16

II.  BANKRUPTCY PROCEDURAL HISTORY ................................................................ 16

III.  LEGAL ARGUMENT ............................................................................... 17

  A.  Debtor has Intentionally Misstated His Debts and Expenses ............................. 19

  B.  Debtor has Dishonestly Attempted to Mislead the Court and has Misrepresented His
      Income ................................................................................ 21

  C.  Debtor is Attempting to Unfairly Manipulate the Bankruptcy Code ....................... 22

  D.  Debtor is Seeking to Discharge Obligations to His Ex-Spouse under His Agreed
      Divorce Judgment ...................................................................... 23

  E.  Srivastava's Claim Would Not Be Discharged in Chapter 7 .............................. 23

  F.  Debtor Filed Chapter 13 Solely to Avoid Payment to Srivastava, not for Legitimate
      Debt Relief ........................................................................... 24

Conclusion .................................................................................... 28

# TABLE OF AUTHORITIES

*In re Breon*, 94 B.R. 576 (Bankr. D. Minn. 1988) .................................................................. 23, 24

*In re Fleury*, 294 B.R. 1 (Bankr. D. Mass. 2003) ...................................................... 22, 23, 24, 26

*In re Griffith*, 203 B.R. 422 (Bankr. N.D. Ohio 1996) .......................................................... 23, 24

*In re Haque*, 334 B.R. 486 (Bankr. D. Mass. 2005) .............................................................. 23, 26

*In re Ho*, 274 B.R. 867 (9th Cir. BAP 2002) ............................................................................... 26

*In re La Trinidad Elderly LP SE*, 2021 WL 2280664, (1st Cir. BAP 2021) ................................. 16

*In re Mattson*, 241 B.R. 629 (Bankr. D. Minn. 1999) ................................................................. 24

*In re Moog*, 159 B.R. 357 (Bankr. S.D. Fla. 1993) ................................................................ 23, 24

*In re Pearson*, 354 B.R. 558 (Bankr. D. Mass. 2006) ...................................................... 18, 21, 26

*In re Sullivan*, 326 B.R. 204 (1st Cir. BAP 2005) ........................................................... 16, 25, 26

*In re Virden*, 279 B.R. 401 (Bankr. D. Mass. 2002) ........................................................... passim

*In re Zizza*, 500 B.R. 288 (1st Cir. BAP 2013) ........................................................................... 19

*Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007) .......................................................... 16

*Torres Martinez v. Rivera Arce (In re Torres Martinez)*, 397 B.R. 158 (1st Cir. BAP 2008) ...... 16

## INTRODUCTION

Creditor Gita Srivastava ("Srivastava"), the holder of divorce-related claims against Andrew Greenhut (the "Debtor"), hereby submits her *Post-Trial Memorandum* in support of her motion to dismiss the Debtor's chapter 13 bankruptcy proceeding, which was filed in bad faith. Application of the standard developed by this Court requires dismissal. Evidence available to the Court for consideration and application of the relevant standard includes: (i) facts stipulated to by the parties in their *Joint Pretrial Memorandum* filed on October 22, 2020 [Doc. No. 248]; (ii) admitted exhibits set forth in the parties' joint *Exhibit List for Trial Scheduled for May 11, 2021, and May 12, 2021*, filed on May 4, 2021 [Doc. No. 280]; (iii) sworn testimony provided by the Debtor and his parents via deposition; and (iv) transcripts of the trial conducted by this Court on May 11, 2021, and May 12, 2021.

The standard for dismissal of a petition filed in bad faith includes multiple factors: (i) the debtor's accuracy in stating debts and expenses; (ii) the debtor's honesty in the bankruptcy process, including attempts to mislead the court and misrepresentations; (iii) whether the Bankruptcy Code is being unfairly manipulated; (iv) the type of debt sought to be discharged; (v) whether the debt would be dischargeable in a chapter 7; and (vi) the debtor's motivation and sincerity in seeking chapter 13 relief. Every one of these factors demands dismissal in this case.

The Debtor intentionally failed to accurately state his debts and expenses. He has deliberately misstated and undervalued the claims of Srivastava, and has manufactured a "loan" from his parents. The Debtor has repeatedly attempted to mislead the Court by, *inter alia*, misrepresenting his income. He knowingly lied about his employer, his salary, and expected changes to his income. Even when these misrepresentations were discovered, the Debtor delayed over a year before disclosing his true income. The Debtor manipulated the Bankruptcy Code by artificially underreporting Srivastava's claim in order to avoid the debt limits in chapter 13. The

Debtor also intentionally stopped paying his credit card debts, which he had previously always paid in full until the eve of filing bankruptcy, so as to manufacture claims in addition to Srivastava's claim, thereby attempting to falsely demonstrate a need for bankruptcy relief. The Debtor's obligations to Srivastava constitute divorce obligations which would not be discharged in a chapter 7. Based on the Debtor's own testimony, the sole reason for his bankruptcy filing was to avoid his otherwise valid obligations to Srivastava—which he has never made any good faith effort to meet—in this two-party dispute.

From the time the Debtor entered into his Agreed Divorce Judgment in 2015 through the date of trial in this matter, he has enjoyed income of more than $1.3 million. The Debtor did not file bankruptcy out of hardship. He does not lack the ability to pay Srivastava's claim, but rather any desire to pay. The Debtor instead has used his vast earnings to fund litigation rather than make voluntarily agreed-upon payments.

The admitted facts and exhibits in this case alone demonstrate the lack of good faith by the Debtor irrespective of any testimony or interpretation of disputed allegations. These facts are amply sufficient for dismissal under virtually every bad faith dismissal case decided by this Court over the past two decades. In further support of this Memorandum, Srivastava represents as follows:

## I.      UNDISPUTED FACTS

Srivastava's claims arise out of the divorce proceeding between the parties, *In the Matter of the Marriage of Gita Srivastava and Andrew D. Greenhut and in the Interest of D.S., a Child*, filed in the 470th Judicial District Court of Collin County, Texas (the "Texas Trial Court"), Docket No. 470-55383-2015 (the "Divorce Case"), on September 25, 2015. *Joint Pretrial Memorandum* ("JPM") at ¶ 1. On November 25, 2015, the Texas Trial Court entered the *Agreed Final Decree of Divorce* (the "Agreed Divorce Judgment"), signed by both parties, approving the

4

property division proposed by the Debtor. JPM at ¶ 2. Both Srivastava and the Debtor assented

to entry of the Agreed Divorce Judgment. JPM at ¶ 3. Neither party appealed the Agreed Divorce

Judgment. JPM at ¶ 4.

### A.    Debtor's Undisputed Obligations under the Agreed Divorce Judgment

According to the terms of the Agreed Divorce Judgment, the Texas Trial Court finalized

the division of marital assets between the parties. JPM at ¶ 5. The Agreed Divorce Judgment sets

forth the Debtor's obligations to Srivastava. JPM at ¶ 6. The Debtor's obligations include an

amount to be paid over time (the "Property Settlement Amount"), and additional payments

arising out of the Debtor's future income.[1] JPM at ¶ 7. The Property Settlement Amount is

comprised of the principal sum of $210,000, payable in equal monthly installments of $3,500.

JPM at ¶ 8.

Under the terms of the Agreed Divorce Judgment, the Debtor is also obligated for

additional payments (the "Overage Amount"), calculated upon, *inter alia*, any "windfall" event:

> THE PARTIES AGREE AND IT IS THEREFORE ORDERED that if,
> after the date this Order is signed by the Court up until the date that
> ANDREW D. GREENHUT dies, Husband obtains a windfall event, such
> as his receiving an inheritance, a large increase in income, or a large gift,
> any of which are in excess of $30,000.00 per year or more, Husband shall
> transfer all of his interest or all of such amount into an account at the
> discretion of and as directed by Wife for the child, D.S., or in a trust for
> the benefit of the child, D.S.. The parties stipulate that the Husband's
> current income at the time this order is entered is $140,000.00 per
> year…THE PARTIES AGREE AND IT IS THEREFORE ORDERED
> that Husband shall inform Wife in writing each year on or before
> December 31st of each year, beginning in the year 2016 (i.e., on
> December 31, 2016), of any inheritance, increase in income, or gift he
> received (other than his $140,000.00 salary) that year in excess of
> $30,000.00…

---

[1] The Agreed Divorce Judgment also awarded Srivastava the sum of $10,000 from the Debtor for home renovations,
which amount was eventually paid three years later through garnishments ordered by the Texas Trial Court.

The Debtor made the first five monthly payments (i.e., $17,500) toward the Property Settlement

Amount and then ceased making the required payments after June 1, 2016. JPM at ¶ 9–10.

### 1.      Debtor's Baseless Litigation, 2016-2020

On April 21, 2016, the Debtor began a fruitless and baseless strategy to avoid his

obligations to Srivastava by collaterally challenging his own agreement. JPM at ¶ 11. On

December 8, 2016, the Debtor filed a "Petition for Bill of Review" in the State District Court of

Collin County, Texas, relating to the provisions of the property division settlement set forth in

the Agreed Divorce Judgment. *Id.* The State District Court of Collin County, Texas tried the Bill

of Review and, ultimately, denied it. JPM at ¶ 12. The Debtor then appealed the decision to the

Court of Appeals for the Fifth District of Texas at Dallas. *Id.* The Court of Appeals upheld the

bill-of-review court's decision denying the Debtor's Bill of Review with respect to the Agreed

Divorce Judgment. *Id.* The Debtor then appealed to the Texas Supreme Court with a Petition for

Review. JPM at ¶ 14.

On February 14, 2017, Srivastava began enforcement proceedings (the "Enforcement

Actions") against the Debtor with respect to his non-payment of the $3,500 installments and

another payment due of $10,000, as well as the Debtor's failure to disclose in writing any

inheritance, large increase in income, or large gift pursuant to the Agreed Divorce Judgment for

the year ending December 31, 2016. JPM at ¶ 15. On March 30, 2017, the State District Court

granted Srivastava a money judgment in the amount of $39,061.91, including $1,061.91 in

statutory interest, and an additional $15,487.75 in legal fees. JPM at ¶ 16.

The Debtor eventually voluntarily dismissed his Petition for Review at the Texas

Supreme Court regarding the Agreed Divorce Judgment. JPM at ¶ 23. The Agreed Divorce

Judgment is, and has been since December 2015, a final and enforceable order, and Texas courts

have repeatedly enforced it against the Debtor despite his various protestations. JPM at ¶ 24.

### 2.      Srivastava's Forced Collection Efforts

On October 29, 2018, Srivastava sought and obtained a Judgment of Garnishment pursuant to the Enforcement Action against the funds held on deposit for the Debtor at Bank of America in the amount of $13,344.45. JPM at ¶ 17. On November 26, 2018, Srivastava obtained another Judgment of Garnishment against the funds held on deposit for the Debtor at Fidelity Investments in the amount of $39,975.02. JPM at ¶ 18. Additionally, on November 26, 2018, Srivastava obtained another Judgment of Garnishment against the funds held on deposit for the Debtor at TD Ameritrade in the amount of $6,631.09 (all of the judgments of garnishment collectively, the "Garnishments"). JPM at ¶ 19. In total, Srivastava received from the Debtor's accounts the aggregate sum of $59,950.56 as a result of the Garnishments. JPM at ¶ 20. Pursuant to the Garnishments, $28,000 was applied to the outstanding Property Settlement Amount, with the remainder being applied to interest and attorneys' fees and costs. JPM at ¶ 21. Accordingly, the outstanding amount of the principle Property Settlement Amount alone totals $164,500. JPM at ¶ 22.

**B.      Undisputed Evidence of Debtor's Income and Value of Srivastava's Claim**

For the period from 2015 through 2019 alone, the Debtor had income, from all sources, in the amount of nearly $1,000,000:

| YEAR | AMOUNT | AMOUNT |
|------|--------|--------|
| 2015 | $131,025.78[2] | $136,744.90[3] |
| 2016 | $182,140.34[4] | $178,309.27[5] |
| 2017 | $195,388.51[6] | $193,187.03[7] |
| 2018 | $201,603.82[8] | $199,275.87[9] |
| 2019 | $209,673.61[10] | $206,038.50[11] |
| **TOTAL** | **$919,832.06** | **$913,555.57** |

These amounts do not include stock options granted to the Debtor by his new employer, DataRobot, or expected increases in 2020 and beyond.

As of the Petition Date, the Debtor owed Srivastava at least $432,186.68, which amount does not include: (a) additional interest; (b) attorneys' fees and costs; and (c) additional increases to the Debtor's income:

| CLAIM | AMOUNT |
|-------|--------|
| Base Amount | $164,500.00[12] |
| Overage Amount | $228,806.28 |
| Interest | $38,880.40 |
| **TOTAL** | **$432,186.68** |

---

[2] Debtor's Answer to Interrogatory No. 2, Exhibit 18 at 675–76 (all page number references refer to page numbers at upper right-hand corner of single PDF file submitted of all exhibits); JPM ¶ 74.
[3] Debtor's W-2 statements, Ex. 30 at 1229–30.
[4] Ex. 18 at 676–77; JPM ¶ 75.
[5] Ex. 33 at 1256–57.
[6] Ex. 18 at 676; JPM ¶ 76.
[7] Ex. 36 at 1281–82.
[8] Ex. 18 at 676; JPM ¶ 77.
[9] Ex. 39 at 1305.
[10] Ex. 18 at 676; JPM ¶ 78.
[11] Ex. 67 at 1520–21.
[12] JPM at ¶ 22.

The Overage Amount is calculated as follows:

| YEAR | TOTAL INCOME[13] | AMOUNT AT LEAST $30,000 IN EXCESS OF $140,000 | OUTSTANDING INDEBTEDNESS[14] | INTEREST |
|---|---|---|---|---|
| 2015 | $131,025.78 | $0.00 | $0.00 | $0.00 |
| 2016 | $182,140.34 | $42,140.34 | $73,140.34 | $3,657.02 |
| 2017 | $195,388.51 | $55,388.51 | $128,528.85 | $6,426.44 |
| 2018 | $201,603.82 | $61,603.82 | $232,132.67 | $11,606.63 |
| 2019 | $209,673.61 | $69,673.61 | $343,806.28 | $17,190.31 |
| **TOTAL** | | **$228,806.28** | **$343,806.28** | **$38,880.40** |

Based upon Texas state law and orders of the Texas court in the Enforcement Actions,

Srivastava is entitled to interest and attorneys' fees in connection with her claim. JPM at ¶ 16;

Ex. 54 at 1431; Ex. 55 at 1434; Ex. 56 at 1438; Ex. 57 at 1442. Additionally, if the Debtor's

Parents' purported claims were properly classified, those amounts would necessarily be included

in Srivastava's claim, pushing it well above $650,000. JPM at ¶ 9.

    **C.**    **Undisputed Evidence and Testimony of Debtor Shows he Misrepresented his Employment and Income**

The Debtor made the decision to file for bankruptcy relief in late 2018. JPM at ¶ 84. As

soon as he made that decision, he immediately stopped paying his credit card debts. *Id.* The

Debtor then went on to wait for approximately four months before actually filing his bankruptcy.

JPM at ¶ 32.

On the day of the Debtor's bankruptcy case filing, March 12, 2019, the Debtor was

employed as a Data Scientist with LogMeIn, Inc. ("LogMeIn"), an internet-based remote

computer access company in Boston, Massachusetts. JPM at ¶ 27. The Debtor had, however,

---

[13] Income figures drawn from Debtor's Answer to Interrogatory No. 2 in Exhibit 18 as set forth above.

[14] The outstanding amount and interest calculations are for illustration purposes only. Interest is calculated at 5% per annum consistent with prior Texas Trial Court orders. Amounts include outstanding payments of Base Amount at rate of $3,500 per month, plus any Overage Amount calculated as of 12/31 of each preceding year; e.g., 2016 total includes 6 months of outstanding monthly payments of the Base Amount ($21,000) from 2016, plus the outstanding $10,000 home renovation amount, plus the $42,140.34 of the Overage Amount for 2016. Notwithstanding the foregoing, Srivastava does not concede that this simple interest calculation sufficiently accounts for her claim, and expressly reserves all rights in connection with the calculation of appropriate interest on unpaid amounts due and owing from the Debtor.

already interviewed with DataRobot, Inc. ("DataRobot"), in or around late 2018 and early 2019.

JPM at ¶ 28. The Debtor received an offer of employment on January 18, 2019, from DataRobot,

such employment to begin on March 25, 2019, at a salary of $200,000, together with a $10,000

signing bonus and participation in a stock option plan. JPM at ¶ 29.

On January 23, 2019, the Debtor signed in blank his bankruptcy petition and declaration

of electronic filing (which was not actually filed until March 12, 2019). JPM at ¶ 30; Ex. 4 at

401. On January 25, 2019, the Debtor accepted the employment offer of DataRobot. JPM at ¶ 31;

Ex. 48 at 1362. On March 12, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 13 of title 11 of the United States Code (the "Bankruptcy Code") in the

United States Bankruptcy Court for the District of Massachusetts (Eastern Division). JPM at ¶

32.

Together with his petition, the Debtor filed his schedules of assets and liabilities and

various statements, including the statement of financial affairs (collectively, the "Schedules" and

each a "Schedule" or "Statement"). JPM at ¶ 34. On the Petition Date, the Debtor was

*technically* still employed with LogMeIn. JPM at ¶ 33. In reality, the Debtor had two months

prior accepted a new position at DataRobot. JPM at ¶ 29. In fact, the Debtor quit his position at

LogMeIn *on the Petition Date itself*. Ex. 65 at 1499. Just days later, he began work at DataRobot.

JPM at ¶¶ 29, 62; Ex. 18 at 676. The Debtor failed to disclose this new, higher paying, position

in his Schedules and other bankruptcy filings.[15]

On June 6, 2019, Srivastava filed a motion to dismiss [Doc. No. 42] (the "Motion to

Dismiss") the Debtor's case for cause including, but not limited to, the Debtor's bad faith in

filing his chapter 13. JPM at ¶ 59. On his Schedule I, filed on March 12, 2019, the Debtor

indicated that was employed by LogMeIn, with an annualized salary of about $155,000. JPM at ¶

---

[15] Debtor's Schedule I, Ex. 5 at 420.

60; Ex. 5 at 420. The Debtor further represented, in response to Question 13 on Schedule I, that

he did not expect any changes to his income in the next year. JPM at ¶ 61; Ex. 5 at 421.

Immediately after filing, on March 25, 2019, the Debtor began the new job at DataRobot. JPM at

¶ 62. In fact, the Debtor's income was not $155,000 per year, but $210,000, plus various

incentives including stock options, an increase of $55,000, or at least 35%, or over $4500 per

month more than he was previously making (and more in fact, than the monthly payment he

admitted that he was required, but failed, to make to Srivastava). Ex. 48 at 1361.

The Debtor during his testimony stressed that he, an MIT-educated data scientist,

reviewed drafts of his Schedules some five to ten times for accuracy. Ex. 1 at 139–40.

Nevertheless, the Debtor specifically did not include any information about his massive increase

in income. Despite himself negotiating the start date and timing his termination from his old job,

the Debtor affirmatively lied about expected changes to his income in the coming year.

Pursuant to the Court's discovery scheduling order, Srivastava propounded discovery on

the Debtor, including:

1.   *Srivastava's First Request for Production of Documents to Andrew
     Greenhut* (collectively the "Document Requests" and each the "Document
     Request No. [X]"); and

2.   *Srivastava's First Set of Interrogatories to Andrew Greenhut* (collectively,
     the "Interrogatories" and each the "Interrogatory No. [X]"). JPM at ¶ 63.

The Debtor provided the *Debtor's Responses to the Request for Production of Documents

of Creditor Gita Srivastava* (collectively, the "Responses to Document Requests" and each the

"Response to Document Request No. [X]") dated February 27, 2020. JPM at ¶ 64. Together with

his Responses to Document Requests, the Debtor furnished numerous documents. JPM at ¶ 65.

The Debtor submitted his *Answers of Debtor in Response to the Interrogatories Propounded by

Creditor Gita Srivastava* (collectively, the "Answers to Interrogatories" and each the "Answer to

Interrogatory No. [X]") dated March 6, 2020. JPM at ¶ 66. Together with his Answers to

Interrogatories, the Debtor supplemented his Responses to Document Requests with additional documents. JPM at ¶ 67.

As part of the discovery process, the Debtor was deposed on February 10, 2020. JPM at ¶ 68. The Debtor's parents, Alan and Gloria Greenhut, were deposed on February 21, 2020. JPM at ¶ 69. The Debtor testified at his deposition that took place on February 10, 2020, that he was then currently employed by DataRobot, not LogMeIn. JPM at ¶ 70. Almost a year into bankruptcy proceedings, this was the first Srivastava was alerted to his changed employment, and as of this date, Debtor had yet to notify the Court, the Trustee, or file any documents disclosing this material information. Indeed, the Debtor continued to conceal this information from the Court for an additional four months.

### D. Undisputed Evidence and Testimony of Debtor Shows He had No Meaningful Non-Insider Debts and No Pressure from Any Creditors

The Debtor identified claims in his Schedules to include ***only*** the claims of:

1. four credit card companies (collectively, the "Credit Card Debts");

2. the Internal Revenue Service (the "IRS") and Massachusetts Department of Revenue (the "MDOR");

3. an automobile loan (the "Auto Loan");

4. Srivastava; and

5. the Debtor's own parents, Alan and Gloria Greenhut (the "Debtor's Parents"). JPM at ¶ 79.

The Debtor listed balances on his schedules for each of the Credit Card Debts:

1. Elan Financial Service (account ending -3036) ("Fidelity"): $247.

2. Chase Card Services (account ending -5285) ("Chase"): $112.

3. Capital One (account ending -6274) ("Capital One"): $388.

4. Barclays Bank Delaware (account ending -0097) ("Barclays"): $1,373. JPM at ¶ 80.

In his Answer to Interrogatory No. 9(d), the Debtor disclosed that the Credit Card Debts were incurred substantially in December 2018, one month prior to his signing the petitions for bankruptcy relief:

1.   Fidelity—between 12/28/2018 and the Petition Date.

2.   Chase—between 12/8/2018 and the Petition Date.

3.   Capital One—between 12/21/2018 and the Petition Date.

4.   Barclays—between 12/5/2018 and the Petition Date. JPM at ¶ 81.

The Debtor testified that he had not been making payments on behalf of the Credit Card Debts, and that he was receiving pressure from the Credit Card Debt companies for missing or late payments and fines. JPM at ¶ 82. In reality, the Debtor had been current on all of his credit card payments right up through the date he decided to file bankruptcy in December 2018. JPM at ¶ 83. Each of the credit card accounts was current as of December 2018, and in some instances there was no balance because the cards were paid in full every month. JPM at ¶ 84. The Credit Card Debts total only about $2,000, and represent less than one-quarter of one percent (i.e., less than 0.25%) of the Debtor's scheduled debts. JPM at ¶ 87.

The Debtor also listed tax obligations (collectively, the "Tax Claims") on his Schedules to both the IRS ($4,152) and the MDOR ($291). JPM at ¶ 88. No other tax claims were listed. JPM at ¶ 89. The Debtor testified that he filed bankruptcy in part due to the pressure of his tax obligations. JPM at ¶ 90. Although the Debtor had allowable tax debts for tax year 2018 at the time the Debtor's bankruptcy filing, the payment of those tax obligations were not yet due to be paid at that time. JPM at ¶ 91. The Debtor testified that he was not in fact receiving any pressure from either the IRS or the MDOR which caused him to file for bankruptcy relief. JPM at ¶ 92.

The Debtor identified the Auto Loan in his Schedules, indicating a secured loan in connection with his automobile. JPM at ¶ 93. The Debtor alleged that the Auto Loan also

contributed to his need to file. JPM at ¶ 94. The Debtor was current on the Auto Loan at the time

of filing, and continued to make payments postpetition. JPM at ¶ 95.

### E.    Undisputed Evidence and Testimony of Debtor and His Parents Shows the Alleged "Loans" were Actually Gifts, Mischaracterized to Reduce Tax Liability and Dilute Srivastava's Claim

The Debtor scheduled claims based upon a purported loan from the Debtor's Parents in

the amount of $219,167.24, which included interest. JPM at ¶ 96. The Debtor did not include

interest in the claims of any party other than his parents, including the claim of Srivastava. JPM

at ¶ 97. The Debtor and his mother testified that the funds were given to the Debtor between

April 2016 and October 2018. JPM at ¶ 98. No funds were advanced to the Debtor by the

Debtor's Parents after October 2018. JPM at ¶ 99. On or about May 21, 2019, the Debtor's

Parents filed a proof of claim asserting a claim against the Debtor's estate totaling $219,167.24.

JPM at ¶ 100.

Despite his attempts to characterize the Debtor's Parents' transfers as loans, both the

Debtor and his parents testified extensively in contradiction to such characterization. The

Debtor's mother testified throughout that she did not ever discuss loan terms, repayment terms or

schedule, interest, or other typical loan details with the Debtor (or, for that matter, anyone else).[16]

She testified that she had no idea what the Debtor did for work or what his income was.[17] She did

not ever contact a lawyer to draft a note for her advances to the Debtor, and claimed to have no

interest whatsoever in the loan process.[18]

The Debtor's father showed, if anything, even *less* interest in being repaid the funds he

gave the Debtor. In both his deposition and at trial he testified consistently that he had little to no

contact with the Debtor, only provided funds through his wife, never discussed the alleged loan

---

[16] Transcript of Deposition of Gloria Greenhut, Ex. 2 at 201, 202, 248.
[17] Ex. 2 at 248.
[18] Ex. 2 at 234, 236.

or note with anyone, and was indifferent to repayment.[19] The Debtor's father had never even

read the note.[20] Neither did he review his own proof of claim before signing it.[21] Even when

confronted with the prospect of never being repaid, the Debtor's father demonstrated little

interest or care:

```
 7    Q.   So you're not in a panic to get repaid?
 8    A.   No.
 9    Q.   How would you feel if you never got repaid?
10    A.   I feel that it would be a loss, but I've had a
11         lot of losses in my life; so that's -- I'm used
12         to moving on.[22]
```

In April 2017, the Debtor consulted with an accountant regarding minimizing the

Debtor's tax liability for the funds given to him by his parents.[23] The Debtor revealed that his

primary concerns was to characterize the funds as loans in order to avoid the annual gift limit for

tax purposes, and to allow for his parents to forgive the "loan" over time. *Id.* In effect, the

Debtor's Parents were gifting him the funds but avoiding tax liability by calling them a loan and

then slowly forgiving the "loans" up to the annual gift limit. *Id.* Interest was included solely to

satisfy IRS regulations.[24]

In support of their alleged claim, the Debtor's Parents provided purported promissory

notes that were signed on December 7, 2018. JPM at ¶ 101. The promissory notes allegedly

covered transfers previously made to the Debtor over the two-and-one-half-year period prior to

the Petition Date. JPM at ¶ 102. The Debtor's Parents never made additional advances after the

promissory note was signed.[25]

---

[19] Transcript of Deposition of Alan Greenhut, Ex. 3 at 320, 332–34, 336, 362, 377; Trial transcript for May 12, 2021, at 121, 127.
[20] Ex. 3 at 343, 355.
[21] Ex. 3 at 323.
[22] Ex. 3 at 342.
[23] JPM at ¶ 103; email communications between Debtor and accountant, Robert Ryter, Ex. 62 at 1461–66.
[24] *Id.*; Trial transcript for May 11, 2021, at 139.
[25] Ex. 2 at 265–66.

### F.    Taken Together, Undisputed Evidence Shows Debtor's Filings Paint a Purposefully Incomplete and Inaccurate Picture of His True Financial Situation

Notwithstanding his earlier suggestion that numerous creditors precipitated his bankruptcy filing, the Debtor eventually admitted that he filed for bankruptcy relief primarily due to the financial pressure caused by his unpaid—but not unaffordable—obligations to Srivastava.[26] The Debtor had no meaningful non-insider debts other than his obligation to Srivastava. Ex. 1 at 147–48. Although he stopped paying his credit cards in an effort to bolster his reason for filing, he was not in fact receiving any pressure on these insignificant claims. JPM at ¶ 87; Ex. 1 at 104–05. He even tried to include debts, such as taxes, which were not yet due in a failed attempt to increase his debt and make his filing appear more legitimate. Ex. 1 at 95–96.

In his Schedules, the Debtor also claimed various expenses, including automatic monthly deductions from income.[27] The Debtor disclosed that he was dedicating $1600 per month—approximately one-half the amount of the required payments he avoided making to Srivastava—to his personal savings. *Id.* In addition, the Debtor withheld approximately $3000 per month for taxes, yet listed two additional entries for even more taxes. *Id.* The Debtor included ample reserves for his ongoing, specious legal challenges, entertainment, his dog, and other discretionary categories. *Id.* The Debtor testified that he lives with his partner, but his Schedules did not indicate whether she contributed to any of the household expenses. *Id.*; Ex. 1 at 17.

## II.    BANKRUPTCY PROCEDURAL HISTORY

On March 12, 2019, the Debtor filed his bankruptcy [Doc. No. 1].

On June 6, 2019, Srivastava filed her Motion to Dismiss [Doc. No. 42].

---

[26] Transcript of Deposition of Debtor, Ex. 1 at 130; Ex. 18 at 681.
[27] Debtor's Schedules I and J, Ex. 5 at 420–423.

On January 3, 2020, the Court entered its *Pretrial Order on Good Faith Issues* [Doc. No. 148], bifurcating the legal issues raised in the Motion to Dismiss, and ordered a trial on the sole issue of whether the Debtor filed his bankruptcy petition in bad faith, without prejudice to the remaining bases for relief requested by Srivastava.

The Court conducted a trial on the Motion to Dismiss, limited to the issue of whether the Debtor filed his petition in bad faith, on May 11, 2021, and May 12, 2021.

Following the trial, the Court issued a *Proceeding Memorandum and Order* dated May 12, 2021 [Doc. No. 282]:

> Trial held on May 11, 2021 and May 12, 2021. The trial is concluded, unless closing arguments are requested. The parties may file trial briefs, proposed findings of fact, and proposed conclusions of law by June 25, 2021. The parties may by May 17, 2021, file a joint request to present closing arguments and waive the requirement of filing trial briefs, proposed findings of fact and proposed conclusions of law…

On May 17, 2021, the parties submitted their *Joint Statement Regarding Trial Briefs* [Doc. No. 289], in which they waived closing arguments and the submission of proposed findings of fact and conclusions of law, and indicated that they would be filing trial briefs.

Srivastava hereby submits this Memorandum in compliance with the Court's post-trial order and the parties' joint statement.

### III.    LEGAL ARGUMENT

Section 1307 of the Bankruptcy Code provides:

> …on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a cause under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause…

11 U.S.C. § 1307(c). Although several bases are enumerated in section 1307, such list is not exhaustive and "cause" is not defined therein. *See id.* Accordingly, caselaw has developed to support dismissal on the basis of bad faith by the debtor. *See, e.g., Marrama v. Citizens Bank of*

*Mass.*, 549 U.S. 365 (2007). This makes sense as bankruptcy courts dispense equity, and debtor

bad faith is quite relevant in determining whether to grant the extraordinary relief of discharge

sought by debtors. In *Marrama*, the Supreme Court reviewed collected cases from Courts of

Appeals and concluded "the federal courts are virtually unanimous that prepetition bad-faith

conduct may cause a forfeiture of any right to proceed with a Chapter 13 case." *Id.* at 367; *see*

*also In re La Trinidad Elderly LP SE*, 2021 WL 2280664, *15 (1st Cir. BAP 2021) (recognizing

lack of good faith grounds for dismissal in chapter 13); *Torres Martinez v. Rivera Arce (In re*

*Torres Martinez)*, 397 B.R. 158, 166 (1st Cir. BAP 2008) (same); *In re Sullivan*, 326 B.R. 204,

210–11 (1st Cir. BAP 2005).

Courts in this District apply a multi-factor test to determine whether a case has been filed

in bad faith. Courts consider: (i) the debtor's accuracy in stating debts and expenses; (ii) the

debtor's honesty in the bankruptcy process, including attempts to mislead the court and

misrepresentations; (iii) whether the Bankruptcy Code is being unfairly manipulated; (iv) the

type of debt sought to be discharged; (v) whether the debt would be dischargeable in a chapter 7;

and (vi) the debtor's motivation and sincerity in seeking chapter 13 relief. *See, e.g.*, *Sullivan*, 326

B.R. at 212.

In addition to application of the above factors, Courts within this District recognize

dismissal as the appropriate remedy in a two-party dispute such as the one between the Debtor

and Srivastava. *See In re Virden*, 279 B.R. 401, 410 (Bankr. D. Mass. 2002) ("This is a two party

dispute and it is clear that the Debtor's sole motivation in filing this Chapter 13 case was to avoid

payment of this singular debt."). The Court also was influenced by the lack of other legitimate

debts. *See id.* Here, the Debtor is in fact "burdened" only by his obligations to Srivastava.

Similar to the debtor in the *Virden* case, "the degree to which the Debtor is truly burdened by this

debt is doubtful." *Id.* Indeed, the Debtor appears fully able, but unwilling, to repay the debt in

full and has not accumulated any other meaningful unsecured debt from which he seeks relief.

As in *Virden*

> …the Debtor's filing was motivated by a desire to avoid payment to [the creditor], rather than by any inability to meet his liabilities, such as they are…the Debtor is not making an honest effort to repay his debt to the best of his ability, and this constitutes bad faith sufficient to dismiss the case.

*Id.* at 410–11.

All of the factors considered by courts in this District amply support dismissal of this two-party dispute.

### A.    Debtor has Intentionally Misstated His Debts and Expenses

As reflected in his own testimony and supporting documentation, the Debtor has grossly undervalued Srivastava's claim. Having participated in negotiating the Agreed Divorce Judgment, the Debtor understood his obligation to disclose and pay over to Srivastava any income in excess of $140,000 in any year in which his income exceeded $170,000. Even were the Debtor to deny such an understanding initially, his obligations were vividly clarified in 2017 by the Texas courts in the Enforcement Actions, wherein the Debtor was held to have violated his obligation and was chastised for failing to comply with it. And yet, two years later in his bankruptcy filing, the Debtor once again concealed his income and intentionally excluded a portion of his obligations to Srivastava.

The omission was neither accidental nor minor. The Debtor has self-stated an aptitude for numbers, record-keeping, and accuracy. Even a conservative estimate of Srivastava's claim— *based solely on information provided by the Debtor*—reflects a total of at least $432,000. The Debtor's allegation that the claim is only $164,500—*approximately a third of the actual amount*—is plainly false.

The Debtor's inclusion of his parents' gifts as purported loans is a further misrepresentation. It is a transparent attempt by the Debtor to further dilute any prospective

19

payment to Srivastava. Having exhausted his ten separate bites at the apple with respect to

challenging his own agreed-upon property division, and having finally to commit to some

repayment to Srivastava, however small, the Debtor now seeks to dramatically reduce that

payment by preferring his own parents to his legitimate creditor Srivastava. By declaring his

parents' gifts—gifts he obtained advice from an accountant on maximizing under the IRS tax

code—as loans, the Debtor believes he may simply pay to his parents funds that should be

devoted to Srivastava. The Debtor has never made any good faith effort to pay Srivastava's

claim. Where he previously directed his funds to attorneys futilely fighting a final judgment, he

now directs such funds to his parents; in short, he is eager to pay *anyone* rather than Srivastava,

despite admitting that her claim is valid and he has no defense to its payment.

Missing no opportunity to minimize his payment to Srivastava, the Debtor also inflated

his expenses. He listed contributions to savings of $1600 per month at a time when he did not

make any payment whatsoever to Srivastava. He further identified $1300 per month for pet, legal

fees, taxes (despite withholding another $3000 per month for this purpose already), and bank

services. On a separate line, he added *another* $400 for taxes, without explanation of how this

third entry differed from the other two tax expenses. He devotes $200 for entertainment each

month, and listed an automobile loan payment of $667 per month that was due to expire in

January 2020. Furthermore, it is unclear whether the Debtor's partner contributes to any of these

expenses, potentially further increasing excess income. Inflating his expenses is yet another

instance of the Debtor's misstatement of his debts and expenses. *See, e.g.*, *In re Pearson*, 354

B.R. 558, 561–62 (Bankr. D. Mass. 2006).

Lastly, throughout his many legal challenges to final orders in Texas, the Debtor

routinely mischaracterized his divorce obligations depending on his perceived benefit without

regard for truth or accuracy. The Debtor's latest efforts at obfuscation and misrepresentation are merely a continuation of years of such conduct.

**B.      Debtor has Dishonestly Attempted to Mislead the Court and has Misrepresented His Income**

The Debtor made knowing and intentional misrepresentations to the Court regarding his employer, his income, expected changes to his income, and his liabilities. The Debtor also worked hard to mislead the Court with respect to his actual debts.

The Debtor lied about his employment. At the time he filed bankruptcy, the Debtor had accepted a position at DataRobot for over $210,000 per year. He had accepted that position in January, two months prior to filing. His start date was mere days after the Petition Date. Nevertheless, on his schedules the Debtor indicated that he was employed by LogMeIn at a salary of about $155,000. He further represented, under the pains and penalties of perjury, that he expected *no change to his income for the coming year*. The Debtor continued his concealment of his true employment from the Court for over a year. Nor does the Debtor's eventual disclosure somehow cure his initial misstatement. *See In re Zizza*, 500 B.R. 288, 294 (1st Cir. BAP 2013) ("Equally unavailing is [the debtor's] assertion that she ultimately amended her schedule a second time, disclosing the [previously undisclosed] lawsuits. Several decisions have noted that amendments cannot expunge the falsity of an oath.") (citations and quotations omitted).

The Debtor also misled the Court with respect to his debts. As set forth above, the Debtor grossly underreported Srivastava's claim. He did so for several reasons, including to avoid paying Srivastava what she truly was owed, and to improperly claim relief under chapter 13 in violation of the debt limits imposed by section 109(e) of the Bankruptcy Code.

The Debtor also misled the Court regarding his parents' gifts, instead mischaracterizing them as loans in an effort to prefer his parents and repay gifts to them instead of paying his legitimate obligations to Srivastava.

The Debtor misled the Court regarding his need for bankruptcy relief by manufacturing defaults on his credit card debts in an attempt to demonstrate his need for bankruptcy protection. In reality, the Debtor had routinely paid all of his credit cards in full every month right up until the moment he resolved to file bankruptcy in late 2018. Any claims of pressure from his credit cards to file are specious, as reflected in his testimony. When pressed for a single instance of any debt collection efforts or pressure, the thin tissue of fabrications by the Debtor quickly dissolved.

The Debtor also misled the Court regarding the Tax Claims. Although the Debtor claimed he owed money to the IRS and the MDOR, in fact the Debtor was current and listed future obligations in his Schedules in an effort to appear more needy of bankruptcy relief.

The true picture of the Debtor's financial situation is that he enjoyed substantial excess income, saved generously for retirement, vacationed and gave gifts to his girlfriend, paid all of his regular bills, spent more than some people spend on rent on his dog, and avoided only a single creditor—Srivastava—while financing meritless challenges to her claim financed by the very funds he should have been paying to her.

### C.    Debtor is Attempting to Unfairly Manipulate the Bankruptcy Code

As explained above, the Debtor is trying to unfairly manipulate the Bankruptcy Code to qualify for chapter 13 relief. The Debtor has manufactured claims of his credit card issuers by stopping payment on the eve of bankruptcy so that his case would include creditors other than Srivastava. Even more seriously, the Debtor has misrepresented the amount of Srivastava's claim in an inappropriate attempt to qualify for chapter 13 relief despite being vastly over the debt limit imposed by section 109(e) of the Bankruptcy Code. *If Srivastava's claim were increased by as little as $379.53, the Debtor would be over the cap and ineligible to file chapter 13.*

The Debtor has further manipulated the Bankruptcy Code by including his parents' gifts in the unsecured creditor pool for distribution under his proposed chapter 13 plan with the aim of diluting and diminishing any payment to Srivastava on account of her valid claim.

### D.    Debtor is Seeking to Discharge Obligations to His Ex-Spouse under His Agreed Divorce Judgment

The Debtor's obligations to Srivastava arise out of his Agreed Divorce Judgment. This is indisputable, and indeed the Debtor concedes it. Given the nature of the debt, Srivastava's claim would not be discharged in a chapter 7 banrkuptcy, as set forth more fully below. The special character of Srivastava's claim—as a divorce obligation—satisfies yet another of the factors established in this District for determination of bad faith. "[W]hen the debtor seeks the Chapter 13 superdischarge to discharge debt that would remain undischarged in a Chapter 7, [the debtor's] burden is especially heavy in overcoming an objection…based on good faith." *Pearson*, 354 B.R. at 561–62. The Court in the *Pearson* case placed significant weight on the debtor's attempt to discharge an otherwise nondischargeable debt. *See id.*

### E.    Srivastava's Claim Would Not Be Discharged in Chapter 7

Pursuant to the Bankruptcy Code,

> Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

11 U.S.C. § 727(b). Section 523 of the Bankruptcy Code identifies numerous exceptions to discharge, including non-domestic support obligations owed to an ex-spouse:

> to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement,

23

> divorce decree or other order of a court of record, or a determination made
> in accordance with State or territorial law by a governmental unit

11 U.S.C. § 523(a)(15). The Debtor's obligations to Srivastava inarguably constitute obligations

to his ex-spouse under subsection 15. In a chapter 7 proceeding, therefore, Srivastava's claims

would not be discharged.

Conversely, in a chapter 13, Srivastava's claims could be discharged. *See* 11 U.S.C. §

1328. The chapter 13 discharge is broader, and provides exceptions for only selected claims

under section 523—notably, not claims under 523(a)(15), but only domestic support obligations

under section 523(a)(5). *See* 11 U.S.C. § 1328(a)(2). Srivastava's claims do not constitute

domestic support obligations under the Bankruptcy Code. *See* 11 U.S.C. § 101(14A)(B). The

Debtor's sole motivation in filing his chapter 13 case is to discharge the otherwise

nondischargeable claims of Srivastava.

### F.     Debtor Filed Chapter 13 Solely to Avoid Payment to Srivastava, not for Legitimate Debt Relief

The Court has since clarified that the essential determination of bad faith is "whether the

debtor is attempting to thwart his creditors, or is making an honest effort to repay them to the

best of his ability." *In re Fleury*, 294 B.R. 1, 6 (Bankr. D. Mass. 2003) (citing *Virden*). Here, the

Debtor himself proposed, six years ago, a property division, which was approved by the Texas

court as a final judgment. Waiting until the appeal period had long expired, the Debtor then

began a frivolous series of attacks on the judgment. In every instance—*on at least ten separate

occasions*—the Texas courts have upheld the Agreed Divorce Judgment. The Debtor himself

agreed to the Agreed Divorce Judgment, then let the appeal deadline lapse, then collaterally

attacked it. He lost his attack, lost requests for rehearing, lost his appeal, and lost his subsequent

appeal. Along the way he was found negligent, not diligent, and to have unclean hands. He tried

to attack the Agreed Divorce Judgment again during the Enforcement Actions, losing each time, and losing his motion for rehearing as well.

When the courts finally awarded garnishments to Srivastava, the Debtor filed his bankruptcy petition. Compounding his efforts to avoid payment to Srivastava, the Debtor went on to include the completely fictitious claims of his parents for gifts given over the course of years and documented only by a purported promissory note dreamed up and signed—on the eve of bankruptcy—*after all of the gifts were already given without any condition or contingency.*

This is precisely the conduct proscribed by this Court. *See Fleury*, 294 B.R. at 6, 7; *Virden*, 279 B.R. at 407. As found by the Court in the *Fleury* case, "The filing of bankruptcy solely to thwart a creditor claim rather than making a honest effort to pay debts is bad faith." *Fleury*, 294 B.R. at 8. The Court in the *Fleury* case went on to hold that "the filing of bankruptcy for the sole purpose of avoiding payment of a settlement agreement is filing with a lack of good faith. *See In re Griffith*, 203 B.R. 422, 425 (Bankr. N.D. Ohio 1996) (debtor filed case in bad faith solely to avoid effect of divorce court judgment and order to provide ex-spouse with share of marital property); *In re Moog*, 159 B.R. 357, 361 (Bankr. S.D. Fla. 1993) (Chapter 11 filed by debtor to circumvent ex-spouse's efforts to enforce divorce decree was dismissed as bad faith filing); *In re Breon*, 94 B.R. 576, 577 (Bankr. D. Minn. 1988) (lack of good faith where debtor's sole purpose was to avoid paying debt to ex-spouse)." *Id.* Subsequent decisions by this Court have followed this standard. *See, e.g.*, *In re Haque*, 334 B.R. 486, 489–90 (Bankr. D. Mass. 2005) (holding that filing to avoid a single debt, defeat state court judgments, or pursue two-party dispute constitutes bad faith).

The Debtor has provided no evidence that his bankruptcy filing is anything other than the continuation of a longstanding two-party dispute. This alone is sufficient basis for dismissal in this jurisdiction. *See, e.g.*, *In re Haque*, 334 B.R. 486, 489–9; *Fleury*, 294 B.R. at 8; *In re Virden*,

25

279 B.R. at 410. Although the Debtor claims that he filed for debt relief generally, in fact his listed debts are either *de minimis* or not genuine.

The Debtor has no other meaningful non-insider debts. He intentionally stopped paying his credit card debts with the specific intention of creating additional debts besides the debt to Srivastava. Prior to deciding to file bankruptcy, the Debtor was current on all of his credit cards. The Debtor was also current on his automobile loan and his tax obligations. The Debtor even listed tax debts that were not yet due to make it appear that he had additional obligations forcing him to file. When pressed, however, the Debtor conceded that his reason for filing was to avoid his admittedly valid obligations to his ex-spouse. Filing solely to avoid obligations to an ex-spouse (or any single creditor) is sufficient grounds for dismissal. *See id.*; *see also Griffith*, 203 B.R. at 425; *Moog*, 159 B.R. at 361; *Breon*, 94 B.R. at 577. As in the *Virden* case, his bankruptcy filing is a continuation of the dispute between the Debtor and Srivastava, not his remaining insignificant creditors. *See Virden*, 279 B.R. at 410 (citing *In re Mattson*, 241 B.R. 629, 637–38 (Bankr. D. Minn. 1999) (dismissing case based on finding there was only one creditor of substance, debtors had stalled and avoided payment of prepetition debt to this creditor, and bankruptcy was continuation of strategy to avoid payment)).

The Debtor has not made any good-faith effort to repay his obligations to Srivastava. Instead, despite, after consultation with his own counsel, proposing and voluntarily agreeing to a property division the Debtor mounted a five-year-long, baseless and fruitless challenge to the Agreed Divorce Judgment. The Debtor lost every single one of his 10 challenges. At the same time the Debtor was maintaining and paying all of his other debts, traveling, and giving gifts— including a diamond ring—to his partner, he staunchly refused to make any effort to pay his obligations to only a single creditor—Srivastava. As in the *Fleury* case, the Debtor has "the ability to pay [his] debts, but instead thwarted the Creditor…" *Fleury*, 294 B.R. at 8. Filing

bankruptcy as a litigation strategy to continue fruitless challenges to well established final orders itself constitutes bad faith. *See In re Sullivan*, 326 B.R. at 209.

Based upon the Debtor's own schedules, even setting aside his inflated expenses and false income, the Debtor demonstrates excess income of more than $2000 per month. Removing inflated expenses, including the automobile loan which ended in January 2020, the Debtor's excess income rises to well over $5000 per month. If the Debtor's accurate income is included from his new, higher paying job, the excess income rises still further to nearly $10,000 per month. Certainly among all of this excess income, the Debtor could afford to meet the single obligation he has avoided, namely, his $3500-per-month obligation to his ex-spouse. It is telling that the Debtor's monthly payment obligation under the Agreed Divorce Judgment was only for 60 months—*less, already, than the time he has spent trying to wriggle out of the agreement, and less, in amount, than he spent on legal fees fruitlessly challenging it.*

The Debtor's pattern of delay and avoidance with respect to his self-admitted, valid obligations to Srivastava manifest bad faith. He voluntarily entered the Agreed Divorce Judgment in 2015. Just months later, in early 2016, he simply changed his mind and chose to default. Ever since he has failed to make any effort whatsoever to pay, instead channeling all of his funds into baseless attacks on the agreement. His actions have unfairly forced Srivastava to expend needless time and money, culminating in the 2017 enforcement actions, and continuing in this present bankruptcy proceeding.

During this same time period, the Debtor has earned over $1.3 million. He enjoys substantial increases to his income from year to year. He has shown no reduction in his own spending, and has not allowed his unpaid debts to Srivastava alter his lifestyle in any way. Meanwhile, no other legitimate creditor has gone unpaid during this entire time.

Debtor's actions are the very definition of bad faith.

### Conclusion

As this Court and the Bankruptcy Appellate Panel in this Circuit have consistently held, a lack of good faith is sufficient grounds for dismissal of a chapter 13 proceeding. *See In re Sullivan*, 326 B.R. at 211; *In re Fleury*, 294 B.R. at 5; *In re Virden*, 279 B.R. at 407. No actual malice or fraud is required. *See In re Sullivan*, 326 B.R. at 212; *In re Fleury*, 294 B.R. at 6.

> Neither malice nor actual fraud is required to find a lack of good faith. The bankruptcy judge is not required to have evidence of debtor ill will directed at creditors, or that debtor was affirmatively attempting to violate the law—malfeasance is not a prerequisite to bad faith.

*In re Sullivan*, 326 B.R. at 212 (quoting *In re Ho*, 274 B.R. 867, 876 (9th Cir. BAP 2002). The Debtor's attempts to establish a lack of specific malice toward Srivastava is misguided and irrelevant.

As in numerous similar cases dismissed by this Court, the Debtor's filing is merely his most recent attempt to thwart the proper collection efforts of Srivastava. The Debtor mounted numerous post-final-judgment attacks on his own Agreed Divorce Judgment, losing every single one. He spent years avoiding payment to Srivastava on a debt he concedes is valid, all the while maintaining his own comfortable lifestyle and paying all of his other legitimate debts. Only when finally cornered through garnishment actions did the Debtor immediately seek bankruptcy relief as his last-ditch effort to avoid repayment. *See In re Pearson*, 354 B.R. at 562 (dismissing case filed in bad faith by debtor based on filing as two-party dispute, lack of other significant debts, no attempt to repay creditor, timing of filing immediately after successful collection efforts); *see also In re Haque*, 334 B.R. 486, 490 (Bankr. D. Mass. 2005) (same).

WHEREFORE, Srivastava requests that the Court enter an order: (i) granting the Motion to Dismiss; (ii) dismissing the Debtor's bankruptcy proceeding; and (iii) granting Srivastava such other and further relief as just and necessary.

Respectfully submitted,

GITA SRIVASTAVA,

By her attorneys,

/s/  Alex F. Mattera
Alex F. Mattera, BBO No. 641760
Pierce Atwood LLP
100 Summer Street, 22nd Floor
Boston, MA 02110
Telephone:  (617) 488-8112
Email:        amattera@pierceatwood.com

Dated:  June 25, 2021

## CERTIFICATE OF SERVICE

I, Alex F. Mattera, hereby certify that on the 25th day of June 2021 I caused to be served a copy of the above pleading on all parties registered for electronic service through the CM/ECF system.

/s/ Alex F. Mattera
Alex F. Mattera